**KFC CORPORATION, Plaintiff,**

v.

**MARION–KAY COMPANY, INC.,
Defendant, Counter Plaintiff,
and Third-Party Plaintiff,**

v.

**JOHN W. SEXTON CO., INC., and
Stange Co., Third-Party
Defendants.**

**No. NA 81–207–C.**

United States District Court,
S.D. Indiana,
Indianapolis Division.

Oct. 18, 1985.

Richard A. Getty, Greenebaum, Doll & McDonald, Louisville, Ky., James E. Bourne, Wyatt, Tarrant, Combs & Orbison, New Albany, Ind., Robert R. Feagin, III, Tallahassee, Fla., for plaintiff.

Bruce Markel, Jr., Markel, Markel & Markel, Brownstown, Ind., Edward M. Steutermann, Louisville, Ky., for defendant, counter plaintiff, and third-party plaintiff.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

BARKER, District Judge.

This matter comes before the Court on the November 10, 1983 motion of plaintiff KFC Corporation ("KFC") for summary judgment as to defendant Marion-Kay Company, Inc.'s ("Marion-Kay") counterclaim. Marion-Kay's response to KFC's motion was filed on December 13, 1983. KFC's reply brief was filed on January 30, 1984. Also before the Court is KFC's July 6, 1984 supplemental memorandum of law in support of its motion for summary judgment. On September 5, 1984, Marion-Kay filed its response to KFC's supplemental motion.

KFC's summary judgment originally went to Marion-Kay's March 19, 1982 counterclaim. However, on May 23, 1984 Marion-Kay filed an amended answer and counterclaim and included a third-party complaint against John W. Sexton Co., Inc. ("Sexton") and Stange Co. ("Stange"). The counterclaim against KFC is identical to the third-party complaint against Sexton and Stange. As indicated in its supplemental memorandum of law, KFC's motion for summary judgment goes to Marion-Kay's counterclaim as well as its third-party complaint.

The Court, being duly advised in the premises, now GRANTS KFC's motion for summary judgment on Marion-Kay's amended counterclaim and third-party complaint for the reasons set forth below. In support thereof, the Court enters the following Findings of Fact and Conclusions of Law and Memorandum Decision.

### Findings of Fact

1. KFC initiated this action with the filing of its complaint on December 9, 1981, alleging that Marion-Kay violated § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), through false descriptions and representation of Marion-Kay seasoning products to KFC franchisees of "Kentucky Fried Chicken" restaurants and that Marion-Kay tortiously interfered with KFC's contractual relations with its franchisees. In its amended counterclaim and third-party complaint, Marion-Kay claims that KFC, Sexton, and Stange entered into a contract, combination, and conspiracy to unlawfully restrain trade in violation of § 1 of the Sherman Act, 15 U.S.C. § 1.

2. KFC is a Delaware corporation with its principal place of business at 1441 Gardiner Lane, Louisville, Kentucky, and is the franchisor of "Kentucky Fried Chicken" restaurants.

3. Marion-Kay is an Indiana corporation with its principal place of business at U.S. Highway 50 West, Brownstown, Indiana, and is engaged in the manufacturing of chicken seasoning known variously as "Marion-Kay Seasoning" or "99X Chicken Seasoning."

4. Sexton is a corporation allegedly having a place of business at 222 Riverside Plaza, Chicago, Illinois.

5. Stange is alleged to be a Delaware corporation having a place of business at 342 Northwestern Avenue, Chicago, Illinois.

6. As the franchisor of "Kentucky Fried Chicken" restaurants, KFC has developed and registered certain trademarks and servicemarks used in connection with its business. KFC's registered service marks and trademarks are as follows:

| Mark | Registration Number | Date of Registration |
|------|---------------------|----------------------|
| Cartoon caricature of Colonel with Cane and Chef's Cap (Trademark) | 757,835 | 10/1/63 |
| It's Finger Lickin' Good (Trademark) | 759,776 | 11/5/63 |
| It's Finger Lickin' Good (Trademark) | 801,095 | 12/28/65 |
| Colonel Sanders' Recipe (Service Mark) | 805,773 | 3/15/66 |
| Design of Colonel Sanders' Head (Service Mark) | 806,104 | 3/22/66 |
| Cartoon Caricature of Colonel Sanders with Cane and Chef's Cap (Service Mark) | 807,043 | 4/12/66 |
| North America's Hospitality Dish (Trademark) | 808,595 | 5/17/66 |
| Design of Colonel Sanders' Head (Trademark) | 810,835 | 7/5/66 |
| North American's Hospitality Dish (Service Mark) | 811,497 | 7/19/66 |
| Col. Sanders Recipe Kentucky Fried Chicken (Trademark) | 813,559 | 8/23/66 |
| Col. Sanders Recipe (Trademark) | 814,610 | 9/6/66 |
| Kentucky Fried Chicken (Service Mark) | 815,167 | 9/13/66 |
| Colonel Sanders' Recipe Kentucky Fried Chicken (Service Mark) | 838,062 | 10/31/67 |
| Kentucky Fried Chicken (Trademark) | 838,895 | 11/14/67 |
| We Fix Sunday Dinner Seven Days A Week (Service Mark) | 841,000 | 12/19/67 |
| Representation of Colonel Sanders in White Suit Holding Menu (Service Mark) | 846,026 | 3/12/68 |
| Picturization of Colonel Sanders' Head with Chef's Cap (Service Mark) | 886,050 | 2/10/70 |
| Striped Roof Design and Kentucky Fried Chicken (Service Mark) | 889,169 | 4/7/70 |
| America Loves What the Colonel Cooks (Service Mark) | 991,605 | 8/20/74 |
| Have a Barrel of Fun (Service Mark) | 1,005,464 | 2/25/75 |
| Visit the Colonel (Service Mark) | 1,063,585 | 4/12/77 |

KFC grants each of its franchisees a license to use these trademarks and servicemarks in connection with the preparation and sale of "Original Recipe Kentucky Fried Chicken."

7. Original Recipe Kentucky Fried Chicken is sold only by KFC and its franchisees, and is prepared by a special cooking process featuring the use of a "secret recipe" seasoning known as "KFC Seasoning." This blend of seasoning was developed by KFC's founder, Colonel Harlan Sanders.

8. KFC Seasoning, its blending system, and the method of preparing Original Recipe Kentucky Fried Chicken are subject to protection as trade secrets.

9. As a condition of each franchise contract, KFC requires that its franchisees use only KFC Seasoning in connection with the preparation and sale of Kentucky Fried Chicken.

10. To protect the secrecy of the composition of KFC Seasoning, KFC has designed a blending system for making the seasoning. With permission from KFC, one part of KFC Seasoning recipe is blended by Sexton and another part is blended by Stange. Neither company has knowledge of the complete formulation of KFC Seasoning nor of the other's specific activities in the production of the other's part of the product. Both companies have entered into secrecy agreements with KFC, binding them to maintain the confidentiality of that portion of the KFC Seasoning formula to which each is privy. KFC's relationship with both Sexton and Stange has existed for more than 25 years. No other companies are licensed to blend KFC Seasoning.

11. After KFC Seasoning is blended by Sexton and Stange, it is then mixed together and sold directly by Stange to all KFC retail operators and to distributors acting on behalf of KFC retail operators.

12. KFC neither manufactures nor sells KFC Seasoning to its franchisees and does not receive a royalty or other economic benefit from the sale of KFC Seasoning by Sexton and Stange.

13. Marion-Kay has never been licensed by KFC to manufacture or distribute seasoning to be used in preparing Original Recipe Kentucky Fried Chicken.

14. In early 1973, Marion-Kay requested permission to market its seasoning products to KFC franchisees. By letter dated March 15, 1973, Edward E. Ellis, General Counsel for KFC, advised Marion K. Summers ("Summers"), President of Marion-Kay, that KFC would not grant Marion-Kay permission to sell its seasoning to KFC franchisees for use in the preparation of Original Recipe Kentucky Fried Chicken. The letter provides in relevant part as follows:

"We did explore a number of possibilities here for a mutually beneficial relationship of some kind with you, and I am sorry to say that the conclusion was that we should continue with our present arrangements.

Having come to that conclusion, based on the best information available to us, I should perhaps point out again that an essential element of our contractual relationships with our franchisees is that they use in their operations the spice formula, process and recipe which are the exclusive property of Kentucky Fried Chicken Corporation. Using any other spice formula, process or recipe would be a serious violation of their franchise agreements and a matter of grave concern to KFC is our desire to vigorously protect our trademarks, trade secrets and standards of national uniformity and quality in the preparation and sale of Kentucky Fried Chicken. I well understand that it is not your desire to interfere in any way with our contractual relationships with our franchisees and I solicit your continued cooperation in that regard. This is of course well within the boundaries of business ethics which I believe, after my conversation with you, you have practiced these many years.

* * * "

15. On February 3, 1977, KFC's General Counsel, Michael J. McGraw ("McGraw"), sent a telegram to Summers advising him that KFC had learned that Marion-Kay was supplying KFC franchisees with a Marion-Kay blend of seasoning. McGraw insisted that Marion-Kay cease supplying KFC franchisees with its seasoning product. The telegram reads in its entirety as follows:

"We have just been advised that Marion-Kay is supplying KFC franchisees with a seasoning blend for use in preparing chicken sold as Kentucky Fried Chicken. This comes as quite a surprise since we have raised this issue with you in the past and received assurances that you would not make such sales. As you were advised in March, 1973, an essential element of our contractual relationship with our franchisees is that they use only seasoning prepared from the formula, process and recipe which are the exclusive property of KFC. Your continued sale of Marion-Kay's seasoning product constitutes an intentional interference with our contractual relationship with our franchisees. It also has a substantial impact on KFC's right and obligation to control the quality of products sold under our trademarks.

We must again insist that you immediately discontinue supplying any Kentucky Fried Chicken franchisees with Marion-Kay's seasoning product. Because of the importance of this matter to KFC and the Kentucky Fried Chicken system, we ask that you give us your prompt written assurance that you will comply with this request.

Michael J. McGraw, General Counsel, KFC Corporation"

16. On February 10, 1977, McGraw sent a second telegram to Summers, demanding that Marion-Kay discontinue selling its seasoning product to KFC's franchisees. That telegram reads in full text as follows:

"We have just received additional information concerning your sale of a seasoning blend to Kentucky Fried Chicken franchisees. One of our franchisees in Tennessee has advised KFC that you are supplying as many as 200 Kentucky

Fried Chicken stores with Marion-Kay seasoning products.

When I sent you the February 3 telegram I had hoped your sale of seasoning to our franchisee in Buffalo and Kansas was just an isolated incident. With this new information we are even more concerned with the impact on the Kentucky Fried Chicken system of your continued sale of seasoning to our franchisees. We are particularly concerned that our franchisees are purchasing Marion-Kay seasoning based on your representations that it will produce Kentucky Fried Chicken. If our information is not correct, I am sure you will let me know. Otherwise, we will assume that you are supplying as many as 200 Kentucky Fried Chicken outlets with Marion-Kay seasoning blend despite our previous warnings.

> Michael J. McGraw, General Counsel
> KFC Corporation"

17. In a letter dated February 21, 1977, McGraw again made known KFC's continuing objection to the sale of Marion-Kay seasoning to KFC franchisees and stated that Summers' actions constituted intentional interference with KFC's contractual relationship with its franchisees:

"Dear Mr. Summers:

I am disappointed that you have elected to ignore my telegrams of February 3 and February 10. Your failure to respond is further evidence that your sale of seasoning to our franchisees is designed to intentionally interfere with our contractual relationship with those franchisees. Such a wanton disregard for the concerns we have expressed will only lead to further damage to KFC and the KFC system.

> Very truly yours,
> Michael J. McGraw"

18. On February 10, 1977, a KFC franchisee sought KFC's approval of the use of Marion-Kay seasoning in connection with the preparation of Original Recipe Kentucky Fried Chicken. This request was rejected by KFC by letter dated February 22, 1977.

19. Any conclusion of law stated below, to the extent that it constitutes a finding of fact, is herein incorporated by reference as an additional finding of fact by the Court.

*Conclusions of Law*

1. This Court has jurisdiction over the complaint pursuant to 28 U.S.C. §§ 1331 and 1332 and 15 U.S.C. § 1121. The Court has jurisdiction over Marion-Kay's counterclaim and third-party complaint pursuant to 28 U.S.C. § 1332 and 15 U.S.C. § 15.

2. Marion-Kay's counterclaim and third-party complaint for damages are not time-barred by the four-year statute of limitations contained in Section 4B of the Clayton Act, 15 U.S.C. § 15b, for the reasons that KFC has maintained a continuous and exclusive contractual relationship with Sexton and Stange for the manufacture and sale of KFC Seasoning to KFC franchisees. This allegedly unlawful activity falls within the "continuing violation" exception to the general rule under Section 4B that an action accrues at the time of the initial violation, and thus Marion-Kay may lawfully challenge KFC's activities with regard to the sale and distribution of KFC Seasoning. *See National Souvenir Center v. Historic Figures, Inc.*, 728 F.2d 503 (D.C.Cir.1984).

3. Marion-Kay's claims for injunctive relief are not time barred by the doctrine of laches for the reason that KFC maintained an exclusive and continuous contractual relationship with Sexton and Stange for the sale and distribution of KFC Seasoning. Because KFC's allegedly unlawful activity was ongoing, Marion-Kay did not delay in bringing its counterclaim.

4. In a situation involving the sale of franchise items, there can be no unlawful tying arrangement absent some proof that there has been a sale of two separate products. *Krehl v. Baskin-Robbins Ice Cream Co.*, 664 F.2d 1348, 1352 (9th Cir.1982). *See also Times-Picayune Publishing Co. v. United States*, 345 U.S. 594, 613–14, 73 S.Ct. 872, 883, 97 L.Ed. 1277 (1953). A determination as to whether a franchise may appropriately be regarded as a sepa-

rate product requires an inquiry into the relationship between the franchise itself and the products allegedly being tied to its sale. *Id.* at 1353.

5. In a situation where the "tied products" are commonplace articles, such as paper products, *See, e.g., Kentucky Fried Chicken v. Diversified Packaging,* 549 F.2d 368 (5th Cir.1977), and there is generally only a remote connection between the trademark and the tied products the franchisee is required to purchase, the trademark simply reflects the good will and quality standards of the enterprise itself. *Id.* As such, as long as the franchisee maintains those quality standards, the source of the tied products is not actually related to the value of the trademark itself. Because the franchisor could easily maintain its quality standards through means other than the coerced purchase of the tied product, such a tying arrangement impedes competition and is violative of the Sherman Act. *Id.*

6. Where, as here, however, the tied product is manufactured pursuant to a secret formula, "the franchised outlets serve merely as conduits through which the trademarked goods of the franchisor flow to the ultimate consumer." *Id.* In this situation

"the trademark actually serves as a representation of the end product marketed by the [franchise] system. 'It is to the system and the end product that the public looks with the confidence that the established goodwill has created.'"

*Id.* at 1354 (citing *Siegal v. Chicken Delight, Inc.,* 448 F.2d 43, 49 (9th Cir.1971)). In these citations, the Court is precluded from finding that the trademark is a separate product from the allegedly tied item because the trademark itself and the quality of the end product are identified as a single item. *Id.*

7. The Court finds that the use of the KFC trademarks and servicemarks by the KFC franchisees is so interrelated with KFC Seasoning, that no reasonable person could find that the franchise (trademarks) and KFC Seasoning are two separate prod-

ucts for tying arrangement purposes. Therefore, the requirement that KFC franchisees purchase KFC Seasoning through Sexton and Stange is not an unlawful tying arrangement in violation of Section 1 of the Sherman Act.

8. The Court further finds as a matter of law that KFC may, in order to protect its trade secrets and quality of its goods, choose any manufacturer it pleases to reproduce and distribute KFC Seasoning to the franchisees. The fact that Marion-Kay is precluded from manufacturing and distributing KFC Seasoning is not a violation of the anti-trust laws.

9. Any finding of fact stated above, to the extent that it constitutes a conclusion of law, is herein incorporated by reference as an additional conclusion of law by the Court.

*Memorandum*

This is an action brought by the plaintiff KFC Corporation, a franchisor of Kentucky Fried Chicken Restaurants, against Marion-Kay for alleged tortious interference with KFC's contractual relations with its franchisees. Marion-Kay is a manufacturer of seasoning products and has filed a counterclaim against KFC and a third-party complaint against Sexton and Stange alleging that the restrictive agreement between KFC and Sexton and Stange for the production and distribution of KFC seasoning, also known as Colonel Harlan Sander's "secret recipe," is an unlawful restraint of trade in violation of § 1 of the Sherman Act. This matter is before the Court on KFC's motion for partial summary judgment on Marion-Kay's amended counterclaim and third-party complaint.

KFC and Sexton and Stange have entered into an agreement whereby KFC has permitted both Sexton and Stange to produce a separate part of the secret recipe, which is a blend of spices used in making Original Recipe Kentucky Fried Chicken. Under the contract, Sexton and Stange are obligated not to divulge the recipe for that portion of the formula which they manufacture and neither company knows the specific activity of the other. Once the formula

is blended by Sexton and Stange, it is mixed together and sold by Stange to KFC franchisees. All of KFC's franchisees are obligated to purchase and use KFC seasoning in the preparation and sale of Original Recipe Kentucky Fried Chicken.

In its counterclaim and third-party complaint, Marion-Kay alleges that KFC has violated § 1 of the Sherman Act in two respects. First, Marion-Kay claims that KFC has unlawfully tied the sale of a KFC franchise (tying product) to the sale of KFC seasoning (tied product). Second, Marion-Kay alleges that KFC has wrongfully refused to approve Marion-Kay as an additional supplier of KFC seasoning. Marion-Kay maintains that the recipes and formulas for the making of KFC seasoning are not unique and that Marion-Kay is capable, both financially and technically, of producing KFC seasoning. Marion-Kay claims that the agreement between KFC and Sexton and Stange for the blending of KFC seasoning, and KFC's refusal to deal with Marion-Kay and other spice blenders, is an unlawful restraint on commerce because KFC has foreclosed competition in the sale of seasoning products used by KFC franchises.[1]

KFC has moved for summary judgment on the counterclaim on the following grounds: (1) that Marion-Kay's claims are barred by the statute of limitations and by the doctrine of laches; (2) that the requirement that KFC franchisees purchase only KFC seasoning from Stange is not an unlawful tying arrangement and (3) that it is not unlawful for KFC to refuse to make Marion-Kay a distributor of KFC seasoning. There are no genuine issues of material facts in dispute surrounding these issues; therefore, summary judgment on these claims is appropriate.

### I. Marion-Kay's Claims Are Not Barred By The Statute of Limitations

KFC Corporation argues that the four-year statute of limitations (15 U.S.C. § 15b)

began to run on March 15, 1973, when Marion-Kay was advised by Mr. Edward Ellis, General Counsel for KFC, that KFC would not permit Marion-Kay to sell its products to KFC franchisees. KFC contends that Marion-Kay's cause of action accrued at this time and that the filing of the counterclaim and third-party complaint almost ten years later is time-barred.

Generally, a cause of action "accrues" for purposes of a statute of limitations when the plaintiff first suffers an injury from an unlawful contract or conspiracy. *National Souvenir Center v. Historic Figures, Inc.*, 728 F.2d 503, 509 (D.C.Cir.1984). There is, however, a "continuing violation" exception to this general rule which becomes applicable where the alleged conspiracy has been ongoing. In *Zenith Radio Corp. v. Hazeltine, Inc.*, 401 U.S. 321, 338, 91 S.Ct. 795, 806, 28 L.Ed.2d 77 (1971), the Supreme Court stated the exception in these terms:

> "[i]n the context of a conspiracy to violate the anti-trust laws, ... each time a plaintiff is injured by an act of the defendants a cause of action accrues to him to recover the damages caused by that act and that, as to those damages, the statute of limitations runs from the commission of the act."

Thus, to survive a dismissal, a plaintiff must show that an "overt act" has been committed pursuant to the unlawful contract, combination, or conspiracy within the limitation period. In the context of a tying arrangement, the "overt act" requirement "may be satisfied merely by the parties continuing to maintain contractual relationships that directly affect competition in the tied product market." *National Souvenir Center, supra*, at 510 (citations omitted).

In the present case, Marion-Kay was first injured in early 1973 when KFC in-

---

**1.** In its original counterclaim, Marion-Kay claimed that the § 1, Sherman Act, violation resulted from the fact that Marion-Kay was precluded from selling its seasoning products to KFC franchisees. It appears that this claim has

been abandoned and that Marion-Kay is now contending that KFC has unlawfully foreclosed Marion-Kay from selling KFC seasoning to KFC franchises.

formed its president that Marion-Kay would not be permitted to distribute its seasoning products to KFC franchisees. At first glance, it might appear that Marion-Kay's cause of action accrued then, and that it has thus failed to satisfy the statute of limitations requirement. However, KFC has continued to require its franchisees to purchase KFC seasoning from Sexton and Stange. It has not allowed Marion-Kay, or anyone else, an opportunity to sell its seasoning products to KFC franchisees. Thus, there has been a continuing agreement between KFC and KFC franchisees that the franchisees purchase KFC seasoning from Sexton and Stange. This continuing arrangement, dating back to 1973, has excluded Marion-Kay from the KFC seasoning market in two respects: (1) Marion-Kay has not been permitted to sell its seasoning to KFC franchisees because those franchisees are obligated to purchase KFC seasoning by virtue of the franchise agreement, and (2) Marion-Kay has never been allowed to manufacture KFC seasoning with permission from KFC because of the exclusive agreement with Sexton and Stange for the blending of the secret recipe.

█ Because the alleged contract, combination, and conspiracy prevented Marion-Kay from selling any seasoning product to KFC franchisees, the Court finds that this case falls within the "continuing violation" exception to the general rule that a cause of action accrues when the plaintiff is first injured by the unlawful agreement, and that Marion-Kay has satisfied the relevant statute of limitations and may bring a cause of action for alleged anti-trust violations occurring during the four years immediately preceding the initial filing of the counterclaim.

█ KFC also argues that Marion-Kay unreasonably delayed in bringing its claims for injunctive relief and that those claims are barred by the doctrine of laches. In determining what constitutes an unreasonable delay, courts have turned to the four-year statute-of-limitations requirement for damage claims under the Clayton Act.

*See, e.g., International Telephone and Telegraph Corp. v. General Telephone & Electronics Corp.*, 518 F.2d 913, 928 (9th Cir.1975). The Court finds that, for the same reasons, this case is not barred by the statute of limitations, it is also not barred by laches. Because the alleged violation was continuing, the defendant did not unreasonably delay in bringing its counterclaim and third-party complaint for the violations occurring within the last four years, and Marion-Kay may bring its action for the alleged violation occurring during that period.

Accordingly, KFC's motion for partial summary judgment on the grounds that Marion-Kay has failed to satisfy the limitations period and that this case is barred by the doctrine of laches is DENIED.

## II. No Unlawful Tying Arrangement

In its counterclaim and third-party complaint, Marion-Kay contends that KFC has unlawfully tied the sale of its franchises to the purchase of KFC seasoning from Sexton and Stange. In its motion for summary judgment, KFC argues that there is no unlawful tying arrangement for the sale of KFC seasoning because (1) the seasoning is such an integral part of a KFC franchise that it cannot be considered a separate product for tie-in purposes, and (2) KFC receives no economic benefit from the sale of KFC seasoning to its franchisees. In response, Marion-Kay argues that the question of whether the sale of a KFC franchise is tied to the sale of KFC seasoning is an issue of fact that must be resolved by the jury rather than by a motion for summary judgment.

█ In the present case, the parties do not take issue with the underlying facts. It is not disputed that KFC is a franchisor of Kentucky Fried Chicken Restaurants or that it requires its franchisees to purchase KFC seasoning from Sexton and Stange. It is also not disputed that Sexton and Stange are the exclusive distributors of KFC seasoning. The parties also agree that Marion-Kay sought KFC's approval to

sell its product to KFC franchisees and that KFC rejected that request in early 1973 and on several other occasions. In the context of KFC's motion, the question for this Court, then, is whether there is sufficient evidence in the record to support a finding that as a matter of law the sale of KFC seasoning and a KFC franchise is actually the sale of one product. The Court finds that there is sufficient evidence to allow it to conclude that a sale of only one product has occurred and that there is no unlawful tying arrangement surrounding the sale of KFC seasoning.

■ Section 1 of the Sherman Act provides, in relevant part, that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several states, ... is declared to be illegal ..." 15 U.S.C. § 1. The Supreme Court has interpreted this provision to prohibit only those contracts or actions which the common law had deemed to be undue restraints of trade or which might be unreasonable after considering the changing times and economic conditions. *Cincinnati Riverfront Coliseum, Inc. v. Cincinnati*, 556 F.Supp. 664, 666 (S.D.Ohio 1983) (citing *Standard Oil Company v. United States*, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911) ). Activities such as tying arrangements have been held to constitute *per se* violations of the Sherman Act, if such activities are proven to have occurred. *See United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 210–18, 60 S.Ct. 811, 838, 84 L.Ed. 1129, 1162–63 (1940); *Klors v. Broadway-Hale Stores, Inc.*, 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959). Under a *per se* rule analysis, a plaintiff is not required to prove any anti-competitive consequences of a defendant's activity because those anti-trust acts are considered so typically and traditionally anti-competitive that the courts have found it appropriate to "short-circuit" the usual analysis of competitive effects to allow a presumption of anti-competitive effects, which the courts dub a *per se* violation of the anti-trust laws. *In Re Yarn Processing Patent Validity Litigation*, 541 F.2d 1127, 1134 (5th Cir.1976), *cert. denied* 433

U.S. 910, 97 S.Ct. 2976, 53 L.Ed.2d 1094 (1977).

■ A tying arrangement occurs when a buyer is permitted to purchase a desired product (tying product) only if he agrees to buy a second, generally unwanted, item ("tied product") from the seller. *See, e.g., U.S. Steel Corp. v. Fortner Enterprises, Inc.*, (Fortner II) 429 U.S. 610, 97 S.Ct. 861, 51 L.Ed.2d 80 (1977). It is well-settled that there can be no illegal tie-in under Section 1 of the Sherman Act unless the seller is in fact selling two distinct and separate products. *See Lupia v. Stella D'Oro Biscuit Company, Inc.*, 586 F.2d 1163, 1173 (7th Cir.1978), *cert. denied* 440 U.S. 982, 99 S.Ct. 1791, 60 L.Ed.2d 242 (1979). The question of whether there has actually been a sale of two separate products is generally an issue of fact that must be resolved by the trier of fact. However, where, as here, the underlying facts are not in dispute and there are other relevant uncontroverted facts, summary judgment is appropriate.

The facts in the present case are very similar to those in *Krehl v. Baskin-Robbins Ice Cream Co.*, 664 F.2d 1348 (9th Cir.1982), and the Court finds this case controlling in disposing of Marion-Kay's tying arrangement claim. In *Krehl*, the plaintiffs argued that Baskin-Robbins illegally tied the purchase of Baskin-Robbins' ice cream products to the sale of Baskin-Robbins' franchise and trademark licenses. Under the franchise agreement, Baskin-Robbins' franchisees were required to purchase ice cream products from a designated third-party licensee. At the close of plaintiffs' case-in-chief, the district court granted Baskin-Robbins' motion to dismiss, pursuant to Rule 41(b) of the Federal Rules of Civil Procedure, finding that the plaintiff had not established that the Baskin-Robbins' trademark was a separate product from Baskin-Robbins ice cream. 664 F.2d at 1350–1351.

On appeal, the Ninth Circuit Court of Appeals affirmed the district court's ruling, holding that plaintiffs had failed to show

that the franchise (trademark) itself served merely to represent the end product (ice cream). The Court of Appeals concluded that the two products were so interrelated in the mind of the consumer that they were not separate items for tie-in purposes. *Id.* at 1354. In reaching this conclusion, the court reasoned that under the distribution type system implemented by Baskin-Robbins, the franchisees served merely as conduits through which the trademarked goods flowed to the ultimate consumer. *Id.* at 1353.[2] In these situations the goods are generally manufactured pursuant to a specific or secret formula, and an alternative product of similar quality is not available.[3] The trademark

> "in a distribution franchise system serves merely as a representation of the end product marketed by the system. 'It is to the system and the *end product* that the public looks with the confidence that the established goodwill has created.' Consequently, sale of substandard products under the mark would dissipate this goodwill and reduce the value of the trademark. The desirability of the trademark is therefore utterly dependent upon the perceived quality of the product it represents."

*Id.* at 1354. Again, the Court of Appeals concluded that the tying arrangement doctrine has no application under these circumstances because the trademark serves only to identify the allegedly tied product, and the two items become so interrelated as to preclude a finding that the trademark is a separate item. *Id.*

In the present case the undisputed evidence shows that KFC, as a franchisor of Kentucky Fried Chicken Restaurants, has developed and registered trademarks and service marks with the United States Patent and Trademark Office. Its franchisees are licensed to use these trademarks and service/marks in connection with the preparation and sale of Kentucky Fried Chicken. In addition, KFC has developed certain trade secrets including the complete formula for KFC seasoning, which is a seasoning formula KFC franchisees are required to use in preparing Original Recipe Kentucky Fried Chicken. KFC seasoning was developed by KFC's founder, Colonel Harlan Sanders. Although KFC does not manufacture the seasoning itself, it has entered into agreements with Sexton and Stange for the production and distribution of KFC seasoning to its franchisees. The question before this Court, then, is whether the sale of a KFC franchise, which involves the right to use KFC's trademarks and service marks, is so closely identified with KFC seasoning that both the franchise and seasoning cannot be considered separate products for anti-trust purposes.

KFC has several registered trademarks and service marks that actually identify KFC seasoning, as Colonel Harlan Sanders "Recipe." For example, KFC's trademarks and service marks include the following:

| Mark | Registration Number | Date of Registration |
|---|---|---|
| "Colonel Sanders Recipe" (Service Mark) | 757,835 | 10/1/63 |
| "Col. Sanders Recipe Kentucky Fried Chicken" (Trademark) | 813,559 | 8/23/66 |
| "Col. Sanders Recipe" (Trademark) | 814,610 | 9/6/66 |
| "Colonel Sanders' Recipe Kentucky Fried Chicken" (Service Mark) | 838,062 | 10/31/67 |
| "America Loves What the Colonel Cooks" (Service Mark) | 991,605 | 8/20/74 |

■ As in *Krehl*, KFC's franchise system is a distribution-type system, where the franchised outlets merely serve as con-

---

**2.** In a business format franchising system, the franchisor merely provides a trademark and some supplies to be used in the operation of the business. *Id. See also Siegel v. Chicken Delight, Inc.,* 448 F.2d 43 (9th Cir.1972). In these situations the tied products are generally commonplace articles and are only remotely connected with the trademark itself. *Id.*

**3.** In a business format system a franchisor can easily maintain its quality standards through less intrusive means other than requiring its franchisees to purchase those items from the franchisor. As a result, the coerced purchase of those tied products is nothing "more than an effort to impede competition on the merits in the market for the tied products." *Id.* (citations omitted).

duits through which Original Recipe Kentucky Fried Chicken is sold. Also, the KFC seasoning is made pursuant to detailed specifications and is not available except through Sexton and Stange, KFC's licensees. As such, the franchise merely serves as a representative of Original Recipe Kentucky Fried Chicken, and the desirability of the franchise itself depends upon the quality of the product it represents as KFC seasoning. The tie-in doctrine has no application where the trademark (franchise in this case) serves only to identify the allegedly tied product. *Krehl*, 664 F.2d at 1354. Marion-Kay has presented nothing in opposition to KFC's statement that KFC seasoning is an essential and inseparable part of the product that is identified by the consuming public as Original Recipe Kentucky Fried Chicken.

Based on this evidence, the Court finds that the use of the KFC trademarks and service marks is so interrelated with KFC seasoning that no person could reasonably find that the franchise and KFC seasoning are two separate products. For all of these reasons, the Court GRANTS KFC's summary judgment on this tie-in issue of Marion-Kay's counterclaim and third-party complaint.

### III. Marion-Kay Has No Right To Become A Distributor Of KFC Seasoning

In the counterclaim, Marion-Kay also contends that it is entitled to become a distributor of KFC seasoning. Specifically, Marion-Kay claims that KFC's exclusive arrangement with Sexton and Stange for the production and distribution of KFC seasoning is a restraint of trade in violation of § 1 of the Sherman Act. Marion-Kay maintains that KFC seasoning can be easily duplicated by any competent spice blender and that the rationale of *Kentucky Fried Chicken v. Diversified Packaging Corp.*, 549 F.2d 368 (5th Cir.1977), compels a ruling requiring KFC to open the KFC seasoning market and approve such competent seasoning blenders. KFC, on the other hand, argues that because KFC season-

ing is a trade secret, central to the success of its business, the Court cannot require it to disclose its recipe secret to any supplier claiming it is worthy to produce seasoning.

In *Kentucky Fried Chicken v. Diversified Packaging, supra,* the case relied on by Marion-Kay, KFC brought an action claiming that the defendants were infringing its trademarks and engaging in unfair competition by selling boxes and other supplies to KFC franchisees. 549 F.2d at 372. Defendants had placed KFC trademarks on the supplies without KFC's consent and had allegedly misled the franchisees as to the source and quality of the supplies. Defendants counterclaimed, alleging that KFC's franchise agreements, which required that all franchisees purchase supplies from sources approved by KFC, constituted an unlawful tying arrangement. Specifically, KFC required that its franchisees purchased various supplies from KFC or from approved sources. The franchise agreements provided that the approval "shall not be unreasonable." *Id.* at 373. KFC had approved nine independent suppliers and had maintained its own subsidiary supplier strictly for purposes of supplying these products. KFC had never refused a request for approval by any independent supplier. *Id.* The District Court ruled in KFC's favor on every issue and the Fifth Circuit Court of Appeals affirmed. *Id.* at 372.

On appeal, the Fifth Circuit Court of Appeals stated that a franchisor who requires its franchisees to purchase

"trademarked supplies does not escape the impact of tying principles to any extent. The franchisor's right to prevent others from selling supplies bearing its trademarks must yield to the anti-trust laws' command to open the tied market to competitors." (citations omitted).

*Id.* at 376. The Court recognized, however, that as a defense to the tie-in claim a franchisor could demonstrate that the tied product was necessary to maintain the quality of the end product being sold to the consumer. As a part of this defense, the Court held that it was incumbent upon the

franchisor to show that the "tie constituted the method of maintaining quality that imposes the least burden on commerce." *Id.* The Court of Appeals also held that KFC's approval system did not constitute a tie, stating that the principal evil associated with tying arrangements, *i.e.*, the foreclosure of competition in the tied market, was not present under this system. *Id.* at 378. In addition, the Court held the approved-source system was not an unlawful tying arrangement because the franchisees had the option of shopping around for the supplies:

"The option is limited to approved suppliers, but there are ten such suppliers of cartons, and franchisees are free to nominate additional suppliers whenever they can be found.... Franchisees might fare better if fifty or a hundred suppliers competed for their business, but a market with ten suppliers and unrestrained entry surely poses a far different problem than a market available to the victim of a traditional tie: one supplier and no entry."

*Id.*

Marion-Kay argues that based on *Kentucky Fried Chicken v. Diversified Packaging*, KFC cannot preclude other spice blenders from supplying KFC seasoning to its franchisees as long as the seasoning meets KFC specifications. As mentioned previously, KFC seasoning is manufactured and distributed solely through Sexton and Stange. Unlike the situation in *Diversified Packaging*, KFC has no method of approving other blenders who wish to distribute KFC seasoning.

The facts before the Court in the present case are easily distinguished from the situation in *Diversified Packaging*. KFC seasoning is a trade secret, which this Court has already held constitutes the franchise itself. To require KFC to open up its seasoning market to any spice supplier wanting to supply its franchisees would require KFC to divulge its trade secrets. No Court has ever forced a supplier or manufacturer to disclose a trade secret to a distributor wanting to manufacture and distribute that

product. *See, e.g., Susser v. Carvel Corporation,* 332 F.2d 505, 517 (2d Cir.), *cert. granted* 379 U.S. 885, 85 S.Ct. 158, 13 L.Ed.2d 91 (1964) and *cert. dismissed,* 381 U.S. 125, 85 S.Ct. 1364, 14 L.Ed.2d 284 (1965). *Diversified Packaging* did not involve trade secrets. Rather, in that opinion the Court scrutinized the KFC's approval policies for the distribution of commonplace supplies such as cartons, containers, and napkins bearing KFC's trademark, all of which were available from several sources.

Finally, Marion-Kay alleges that the contractual arrangement between KFC and Sexton and Stange for the distribution of KFC seasoning is evidence of a conspiracy to exclude Marion-Kay as a supplier of the seasoning. Marion-Kay also seems to argue, albeit erroneously, that because KFC has disclosed the trade secret to Sexton and Stange it is estopped from denying supplier status to other spice blenders.

Under these contracts, neither Sexton and Stange is given the complete specifications for the production of KFC seasoning. Rather, each supplier is given only a portion of the "recipe," and each has agreed to maintain the secrecy of the formula to which it has privy. Sexton and Stange have no input whatsoever in KFC's exercise of control over the production, sale, and use of the trade secret. In other words, KFC has maintained unilateral and complete control over KFC seasoning. KFC can terminate the contracts with Sexton and Stange with 120-days from the notice of termination and can select another supplier to distribute KFC seasoning without violating the contract. Thus, in effect, KFC has not disclosed its trade secrets to anyone, which fact disputes Marion-Kay's claims and defeats Marion-Kay's argument that KFC should be estopped from denying disclosure of its trade secrets to other suppliers. This Court will not require KFC to disclose its trade secrets to Marion-Kay, and the fact that KFC has entered into an agreement with Sexton and Stange, for the distribution of KFC seasoning, to the exclusion of Marion-Kay, does not constitute a conspiracy to violate the

anti-trust laws. KFC has an absolute right to choose who will distribute KFC seasoning without violating Section 1 of the Sherman Act.

Accordingly, for all the foregoing reasons, KFC's motion for partial summary judgment on Marion-Kay's counterclaim is GRANTED.